IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HENRY JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 16-cv-0068-NJR-GCS |
| | ) |
| WEXFORD HEALTH SOURCES, | ) |
| INC., SETH MERACLE, MICHAEL | ) |
| CLARK, and VIPIN SHAH,[1] | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Pending before the Court is a motion for summary judgment filed by Defendants Vipin Shah and Wexford Health Sources, Inc. (Docs. 89 and 94) and a motion for summary judgment filed by Defendants Michael Clark and Seth Meracle (Docs. 91 and 92). Plaintiff Henry Jones, through counsel, has responded to both motions (Docs. 102, 103, 104, and 105). For the reasons set forth below, the Court grants summary judgment in favor of Defendants Shah and Wexford and denies summary judgment as to Defendants Meracle and Clark.

## BACKGROUND

In January 2016, Jones filed suit against Defendants Wexford, Meracle, Clark, and Shah alleging deliberate indifference claims related to issues Jones has with his right knee. Defendants Meracle and Clark are correctional officers at Pinckneyville

---

[1] The Clerk's Office is **DIRECTED** to update the docket sheet to reflect the true and accurate name of the following defendant: "Seth Miracle" should be "Seth Meracle." (*See* Doc. 17, p. 2).

Correctional Center where Jones was incarcerated. Jones claims that, upon his transfer to Pinckneyville, Meracle failed to assist him in getting medical attention for his swollen knee, and Defendant Clark forced him to sleep on a top bunk even though he had a visible knee injury and a low bunk permit at his former facility. Defendant Shah is a doctor at Pinckneyville who Jones alleges delayed assessment and treatment of his knee problem and failed to order appropriate tests to diagnosis the cause of his knee pain. Jones also alleges that Defendant Wexford has implemented a cost-cutting policy that prevented him from obtaining necessary testing for the diagnosis of his knee problem.

Jones proceeds on the following four claims:

**Count 1**: Eighth Amendment deliberate indifference claim against Defendant Meracle, for failing to assist Plaintiff to get medical attention or other relief for his swollen knee during the time Plaintiff was forced to stand for hours in the shower on January 21, 2015;

**Count 2**: Eighth Amendment deliberate indifference claim against Defendant Clark for forcing Plaintiff to sleep in the top bonk despite Plaintiff's visible knee injury and low bunk permit;

**Count 3**: Eighth Amendment deliberate indifference claim against Defendant Shah for delaying assessment and treatment of Plaintiff's knee, failing to order tests to diagnose the cause of Plaintiff's swelling and pain, and discontinuing treatment for Plaintiff's painful condition;

**Count 4**: Eighth Amendment deliberate indifference claim against Defendant Wexford for implementing a cost-cutting policy that prevented Plaintiff from obtaining adequate testing and diagnosis of his knee problem.

(Doc. 12, p. 4-5).

By motion filed on April 2, 2018, Defendant Meracle and Defendant Clark move for summary judgment, arguing that they were not deliberately indifferent to Jones's medical needs because neither individual disregarded an excessive risk to his health (Doc. 91). They also argue that they are entitled to qualified immunity (*Id.*).

Defendants Shah and Wexford also move for summary judgment (Doc. 93). Defendant Shah argues that he provided appropriate treatment and did not disregard an excessive risk to Jones's health, and Defendant Wexford denies that there is a policy or practice in place that precluded Jones from receiving appropriate medical care.

## RELEVANT FACTS

In approximately August 2014, while incarcerated at Mt. Sterling Correctional Center (also known as Western Illinois Correctional Center, "WICC"), Jones injured his right knee while playing basketball. He was given ibuprofen and an ace bandage. He also received a low bunk permit because he was not able to climb up on the top bunk (Pl. Deposition, Doc. 92-1, p. 10). The low bunk permit began on December 16, 2014, and ended on February 16, 2015 (Doc. 105-1). According to Jones, the medical professionals at WICC x-rayed his knee and did not find any broken bones, but they did not provide Jones with any specific diagnosis (Doc. 92-1, p. 13).

On December 1, 2014, Jones put in a sick call and was seen by a nurse after he slipped and hit his right knee on a wall (Doc. 92-2). His medical records note that he had a slight limp and swelling at his right knee. He was referred to a doctor and given ibuprofen and advised to avoid basketball and handball until his knee improved (Doc. 92-2). Jones saw a nurse and returned his ace bandage on December 13, 2014. The

nurse noted that Jones had a mild amount of swelling and a slight limp. Jones told her that he couldn't bend his knee without pain and that his pain was increasing. He said that the ibuprofen helped a little, but his knee still hurt. The nurse referred him to a doctor for an evaluation and recommended that he continue the ace bandage and avoid strenuous activity (Doc. 92-2).

Jones was reevaluated by a doctor on December 16, 2014. The doctor's treatment plan recommended discontinuing the ace bandage because Jones reported that it did not help him. It is also included recommendations for icing the knee, taking an x-ray of it, a bottom bunk permit for 60 days, and increasing the dosage of ibuprofen. A nurse practitioner noticed swelling in Jones's knee and prescribed prednisone on January 8, 2015, and scheduled another appointment to check on Jones's swelling. The nurse practitioner saw him again on January 15, 2015. The medical records note that Jones had difficulty sleeping due to pain and could not bend his knee without pain. The records mention a potential knee effusion/sprain (Doc. 92-2). An offender health status transfer summary dated January 18, 2015, notes a knee sprain as a current and chronic problem (Doc. 92-2).

On January 21, 2015, Jones was transferred to Pinckneyville Correctional Center. He was seen by a nurse for intake, and the nurse noted no complaints. Jones was told to continue his medication orders (Doc. 94-3). According to Jones, he was only asked about his medications and was not offered an opportunity to discuss his knee issues with the nurse (Doc. 92-1, p. 63).

Jones testified at his deposition that, when he arrived at Pinckneyville, he was locked in a shower while awaiting a cell assignment. Defendant Meracle came by, and Jones asked to speak with him. Jones showed him his knee and explained that it was swollen badly from the bus ride. He asked for a chair or for the medical staff to come see him (Doc. 92-1, p. 38-39). He testified that Defendant Meracle said he was doing trays on the wing and left. When he came back to pick up the trays, Jones asked him for help again, and he says Defendant Meracle told him there was nothing he could do (Doc. 92-1, p. 39).

According to Defendant Meracle's declaration, he was working as a correctional officer in the segregation unit at Pinckneyville in January 2015. He worked from 3:00 p.m. until 11:00 p.m. He was responsible for the safety and security of the inmates in the segregation unit, and he helped with inmates who were transferred into the segregation wing from an outside facility. It was common for transferred inmates to wait in the shower area until they were placed in a cell. Defendant Meracle does not recall Jones, but he testified that he would not have denied him medical care. He testified that it is common procedure for transferred inmates to see an intake nurse upon arrival and that Jones should have been taken to see medical staff upon intake. Defendant Meracle does not recall Jones asking for a chair. He testified, however, that there are no chairs in the segregation unit that can be used in the shower area. Use of a chair would be a security concern. According to Defendant Meracle, nothing would have prevented Jones from sitting on the floor (Declaration of Seth Meracle, Doc. 92-3). Jones testified that he did not want to sit down on the floor of the shower, describing the shower as "nasty." He conceded, however, that he was able to sit on the floor (Doc. 92-1, p 44).

According to Jones, a correctional officer assigned him to a cell, and he began unpacking his belongings on the bottom bunk. His new cellmate came in and said he also had a bottom bunk permit. The officer called for a lieutenant, and Defendant Clark came to the cell. Defendant Clark left to check and returned to say that Jones's cellmate had a low bunk permit, but Jones only had a low gallery permit. Defendant Clark took Jones to a lower gallery with his cellmate, but he would not honor his low bunk permit. Defendant Clark told him to climb on the top bunk or else he would receive more segregation time (Doc. 92-1, p. 45-47). According to Jones, it was two days later when Defendant Clark told him he needed a low bunk permit from the medical staff at Pinckneyville (Doc. 92-1, p. 51-53). According to Jones, after he got the permit, Defendant Clark did not honor it, and he only moved to a bottom bunk when he got a new cellmate who agreed to allow Jones to have the bottom bunk. Jones then put in several sick calls, but it took him three weeks to get a low bunk permit. After he received the permit, he had it continuously until he left Pinckneyville. He said that he was forced to climb to the top bunk for thirty-two days (Doc. 92-1, p. 53-56).

Defendant Clark was employed as a lieutenant in the segregation unit at Pinckneyville. He worked from 3:00 p.m. until 11:00 p.m. He does not recall Jones, but testified that he would not have denied him medical care or a bottom bunk permit. According to Defendant Clark, when transferring to a new facility, an inmate must be evaluated and issued a new permit by the medical staff at Pinckneyville. Defendant Clark testified that, if Jones did not have a bottom bunk permit from Pinckneyville, he may have told him that he needed to see medical staff to get one. Defendant Clark describes

his responsibilities as ensuring that transferred inmates are secured and placed into cells as soon as possible. He denies having responsibility for issuing bottom bunk or medical permits. He testified that he did not deliberately refuse a bottom bunk for Jones (Doc. 92-4).

On February 15, 2015, Jones saw a nurse to discuss his knee pain. The nurse noted that Jones said his knee could not handle climbing up and down and that he requested a low bunk permit. Jones was given acetaminophen for his pain and was told to return if his symptoms worsened or interfered with daily functions (Doc. 94-3). According to a February 19, 2105 radiology report, an x-ray of Jones's knee was taken at Pinckneyville. It was compared to his x-ray taken on December 17, 2014. The report notes that no fracture, dislocation, or bony abnormality was noted and that no joint effusion was seen (Doc. 94-3). On February 18, 2015, Jones was prescribed 400 mg of Motrin for three months to treat his pain, and his records note that he would be evaluated for physical therapy when he was released from segregation (Doc. 92-2).

Defendant Shah prescribed physical therapy for Jones, and he started therapy on April 13, 2015 (Affidavit of Dr. Shah, Doc. 94-2; Doc. 94-3). The physical therapist noted knee pain with localized swelling and recommended two to three days of physical therapy per week for six weeks. In June 2015, the physical therapist noted that Jones's ACL, PCL, MCL, and LCL were all intact but that Jones had no improvement after two months of therapy. He referred Jones to a doctor consultation (Doc. 94-3)

On or about June 23, 2015, Defendant Dr. Shah prescribed a medication called Mobic to treat Jones's pain and swelling. Defendant Dr. Shah submitted a request for an

MRI for Jones for collegial review with Dr. Ritz on July 6, 2015. Dr. Ritz denied the MRI, noting that physical therapy was not working but that Jones had a BMI of 38. He recommended continuing on the current treatment plan, including the Mobic, and advised counseling Jones to lose twenty-five pounds. Defendant Dr. Shah made an alternative care plan that included Mobic, mild running for exercise, and encouragement for weight loss. Defendant Dr. Shah saw Jones for a follow-up appointment on August 10, 2015. He noted mild swelling and advised Jones to improve his diet and exercise to lose weight. That was his last appointment with Jones before Jones was transferred out of Pinckneyville in November 2015 (Doc. 94-2, Doc. 94-3).

Jones testified at his deposition that he felt like Defendant Dr. Shah pushed him into physical therapy when he should have been sent to a specialist. He described his complaint as being about the delay and denial of treatment, as opposed to the actual treatment he did receive. He wanted a diagnosis as to what was wrong with his knee. Jones conceded that Shah attempted to treat his knee issues, but he testified that there was too much delay and denial in his treatment (Doc. 92-1, p. 21-24).

When Jones left Pinckneyville, he was transferred to Pontiac Correctional Center. He testified that his knee was treated with pain medication, ibuprofen, and a bottom bunk permit at Pontiac. He was then transferred to Menard Correctional Center, where a nurse practitioner recommended an MRI, which a doctor denied. According to Jones, Defendant Dr. Shah did more for him than the other facilities, but he believes Defendant Dr. Shah dragged out his care and the process of figuring out what was wrong with his knee (Doc. 92-1, p. 31-34).

## LEGAL STANDARDS

I. **Summary Judgment Standard**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe,* 743 F.3d 1101, 1105 (7th Cir. 2014), *citing* FED. R. CIV. P. 56(a). *Accord Anderson v. Donahoe,* 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.,* 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012); *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542 (7th Cir. 2014).

II. **Eighth Amendment Deliberate Indifference**

The Eighth Amendment prohibits cruel and unusual punishment and deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance*

*Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). The first consideration is whether the prisoner has an "objectively serious medical condition." *Arnett*, 658 F.3d at 750. *Accord Greeno*, 414 F.3d at 653. "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Hammond v. Rector*, 123 F. Supp. 3d 1076, 1084 (S.D. Ill. 2015) (citing *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014)). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm") ((internal quotation marks omitted) (emphasis added).

The second consideration requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to an inmate's health. *Id.* at 653. The plaintiff need not show the individual "literally ignored" his complaint, but must show that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something

more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Hammond v. Rector*, 123 F. Supp. 3d 1076, 1086 (S.D. Ill. 2015) ("isolated occurrences of deficient medical treatment are generally insufficient to establish . . . deliberate indifference"). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

Assessing this subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-06 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did," *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

## ANALYSIS

A reasonable jury could conclude that Jones's knee pain was an objectively serious medical condition. He complained of pain over a long period of time and medical professionals documented visible swelling during multiple medical visits. Jones was prescribed physical therapy, an ace bandage wrap, pain medication, and medication for swelling during the course of treatment for his knee issues. Medical staff at multiple Illinois Department of Corrections facilities saw fit to offer Jones some measure of treatment for his knee injury. As such, the record supports finding that a reasonable jury could find that Jones can satisfy the first prong of the deliberate indifference test as to his deliberate indifference claims.

### I. Deliberate Indifference Claim Against Seth Meracle (Count 1)

Defendant Meracle had limited interaction with Jones when Jones first arrived at Pinckneyville. While Defendant Meracle does not remember Jones, the parties agree that incoming inmates in the segregation unit at Pinckneyville are held in the showers until their cells are available. Jones was in segregation following a fight at WICC (Doc. 92-1, p. 48). Jones contends that he showed Defendant Meracle his swollen knee, which was aggravated from his bus ride to Pinckneyville, and asked for a chair to sit in. Defendant Meracle does not remember speaking with Jones or seeing his knee, but, according to Defendant Meracle, giving an inmate a chair in the segregation unit would present a security risk. Defendant Meracle testified that Jones would have been able to sit on the floor if he needed to sit due to pain. Jones testified that, while nothing prevented him

from sitting on the floor, he did not want to because he thought the floor was "nasty." (Doc. 92-1, p. 44).

The offender health status transfer summary describing Jones's health completed on January 18, 2015 (prior to his transfer) indicated that Jones had a knee sprain. His January 21, 2015 reception screening at Pinckneyville, documented on the same form, indicated that Jones had no complaints or distress. Jones disputes what is written in the medical record, however, and maintains that he was only asked what medication he was taking. He also testified that he told the nurse about his knee pain and that Defendant Meracle was supposed to speak with the medical staff to help Jones receive treatment for his knee.

The record demonstrates that there is a dispute of fact as to whether Defendant Meracle knew of Jones's knee problems. There also is a dispute of fact as to whether Jones failed to complain about his knee problem to healthcare staff during his reception screening or whether he was not given the opportunity to voice his concerns. Given these disputes, a reasonable jury could conclude that Defendant Meracle knew of Jones's pain and either knowingly or recklessly disregarded it by failing to help him reach out to healthcare staff or by failing to assist him with his injury during the period when Jones was locked in a shower. Accordingly, the Court denies summary judgment as to Jones's claim against Defendant Meracle.

## II. Deliberate Indifference Claim Against Michael Clark (Count 2)

Defendant Clark also does not remember his interactions with Jones. Jones had a low bunk permit before he arrived at Pinckneyville, and Defendant Clark was responsible

for making sure that Jones was placed into a cell. Defendant Clark denies that he has any role in the issuance of bottom bunk permits. Jones maintains that he told Defendant Clark that he could not climb to a top bunk and that Defendant Clark left for a brief period. When Defendant Clark returned, he had determined that Jones had a low gallery permit, but not a low bunk permit. Jones was moved to a different cell but was still required to sleep on the top bunk. Jones claims that two days later he showed Defendant Clark his bottom bunk permit from WICC and that Defendant Clark told him Pinckneyville does not respect other facilities' bottom bunk permits. According to Jones, he then went through the process of securing a bottom bunk permit from the medical staff at Pinckneyville. Jones claims that the next time he saw Defendant Clark, a few days later, he showed the permit to Defendant Clark. Defendant Clark allegedly did not respond.

Jones can delineate a period of thirty-two days at Pinckneyville during which he would have had a bottom bunk permit had he been incarcerated at WICC. During a portion of those days, he received a low bunk permit at Pinckneyville but was not moved to a bottom bunk. Jones claims that Defendant Clark knew he had the low bunk permit and failed to honor it. Jones alleges that he only was able to sleep on a bottom bunk once his cellmate left the cell and a new cellmate moved in and agreed to give Jones the bottom bunk. Given Defendant Clark's lack of recollection and the lack of evidence to the contrary, material issues of fact preclude the entry of summary judgment. Based on the record before the Court, a reasonable juror could conclude that Defendant Clark knew Jones had a knee problem and knowingly or recklessly disregarded his pain.

Accordingly, the Court denies summary judgment as to Jones's claim against Defendant Clark.

### III. Qualified Immunity as to Seth Meracle and Michael Clark

Defendants Meracle and Clark argue that they are entitled to qualified immunity as to Jones's claims against them.

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The qualified immunity test has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct**.** *See Pearson*, 555 U.S. at 232. *See also Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). "The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012) (citations and quotation marks omitted).

The Court has already determined that there are disputes of material fact that prevent finding that Defendants Meracle and Clark did not engage in a constitutional violation. When the facts are taken in the light most favorable to Jones, Defendant Meracle and Defendant Clark could be found to have engaged in conduct that violated Jones's constitutional right. For this reason, Defendants Meracle and Clark are not entitled to qualified immunity.

### IV.  Deliberate Indifference Claim Against Dr. Vipin Shah (Count 3)

As discussed above, Jones disputes that he told the nurse who conducted his reception screening that he had no complaints, but this dispute is not material to his claim against Defendant Dr. Shah. After seeing a nurse for pain medication and to receive a low bunk permit, Jones first saw Defendant Dr. Shah in April 2015. Defendant Dr. Shah prescribed a course of physical therapy. When it was not working, he switched Jones to a prescription medication, Mobic, to address the pain and swelling. He submitted a request for an MRI to collegial review, which was denied by Dr. Ritz. After consultation with Dr. Ritz, Defendant Dr. Shah recommended weight loss and gentle exercise because he thought Jones's weight could be adding strain to his knee. Jones testified that Defendant Dr. Shah gave him more treatment than any other doctor or medical professional that he has seen for his knee injury, but he believes that Defendant Dr. Shah was deliberately indifferent as evidenced by the delay in his treatment and diagnosis.

The record reflects that Defendant Dr. Shah provided Jones with medical treatment. When Jones did not respond to the treatment, Defendant Dr. Shah pursued other treatment options. Other than conjecture by Jones, there is no evidence in the record of any delay or dragging out of care by Defendant Dr. Shah. The record reflects that Defendant Dr. Shah pursued a treatment plan based on his professional judgment, and, as a result, he lacks the culpable mental state required for establishing that he was deliberately indifferent. There is no evidence that he chose an easier or less effective course of treatment without exercising his professional judgment. Instead, the record shows a course of continuing care by Defendant Dr. Shah in accordance with his professional judgment. Because no reasonable juror could conclude otherwise, Defendant Shah is entitled to summary judgment on Jones's deliberate indifference claim.

### V. Deliberate Indifference Claim Against Wexford Health Sources, Inc. (Count 4)

The parties agree that Jones cannot succeed against Defendant Wexford without establishing one of the three factors laid out in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). The doctrine of *respondeat superior* does not apply in Section 1983 cases. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) (citing *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)). In *Monell v. Dep't of Social Services of the City of New York*, however, the Supreme Court held that a municipality may be liable under Section 1983 for constitutional violations resulting from a policy or custom of the municipality. 436 U.S. 658, 690–91 (1978). The Seventh Circuit has extended *Monell* beyond municipalities to include private corporations providing government services,

such as Defendant Wexford. *See Shields*, 746 F.3d at 789. A corporation that has contracted to provide essential government services may be held liable under Section 1983 for constitutional violations caused by unconstitutional policies or customs. *Id.*

Liability under *Monell* may be shown three ways. First, a plaintiff may establish that the unconstitutional action "'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (quoting *Los Angeles County v. Humphries*, 562 U.S. 29, 35 (2010)). Second, the plaintiff might prove that a custom was created by "'those whose edicts or acts may fairly be said to represent official policy.'" *Glisson*, 849 F.3d at 379 (quoting *Monell*, 436 U.S. at 690 – 91). Lastly, a plaintiff may demonstrate liability pursuant to *Monell* is by establishing a widespread custom. *Glisson*, 849 F.3d at 379. Liability may extend to customs "so permanent and well settled as to constitute a custom or usage with the force of law" even though they received no formal approval. *Monell*, 436 U.S. at 91 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)).

A widespread custom may be established by evidence of policymaking officials' knowledge and acquiescence to the unconstitutional practice. *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 511 (7th Cir. 1993). Sufficient evidence may include proof that the practice was so "long standing or widespread" that it would "support the inference that policymaking officials 'must have known about it but failed to stop it.'" *Id.* (quoting *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991)).

Jones pleaded his case as one alleging a widespread custom of cost-cutting, but the facts in the record do not support or point to the existence of such a custom or policy. With respect to Jones, one doctor, Defendant Dr. Shah, submitted an MRI request for collegial review, and it was denied in favor of a different treatment plan. Beyond Jones's conjecture, there is no developed evidence of a pattern or practice of cost-cutting before the Court in this case. Without some modicum of proof to create a question of fact, the claim against Defendant Wexford based on an official or unofficial policy cannot proceed.

In his response to Defendant Shah's and Defendant Wexford's motion for summary judgment, Jones describes Defendant Dr. Shah as the final policymaker available to him at Pinckneyville. Even accepting that as true, there is insufficient evidence to support a *Monell* claim on that basis. First, as described above, the Court concluded that the care by Defendant Dr. Shah did not amount to a constitutional violation. Additionally, the record demonstrates a course of continuous care by Defendant Dr. Shah and the medical staff at Pinckneyville that does not support a finding that there was a custom of cost-cutting as to Jones or even of a more widespread custom at Pinckneyville. A single MRI request was denied, and Jones received pain medication, monitoring, treatment for his swelling, and physical therapy. There is not a pattern or practice of avoiding care for his injury, and there is no evidence of a more widespread custom, policy, or practice by the medical staff at Pinckneyville. Jones merely argues that Defendant Dr. Shah was the final policymaker without pointing to additional details of a constitutional violation beyond those discussed above. As such, the Court grants summary judgment in favor of Defendant Wexford.

## CONCLUSION

For the reasons set forth above, the Court **DENIES** the motion for summary judgment filed by Defendants Seth Meracle and Michael Clark (Doc. 91) and **GRANTS** the motion for summary judgment filed by Defendants Vipin Shah and Wexford Health Sources, Inc. (Doc. 89). Jones's claims within Count 3 against Defendant Vipin Shah and Count 4 against Defendant Wexford Health Sources, Inc. are **DISMISSED with prejudice**. At the close of this case, the Clerk of Court shall enter judgment in favor of Defendant Vipin Shah and Defendant Wexford Health Sources, Inc. and against Plaintiff Henry Jones. The Clerk of Court is **DIRECTED** to terminate Defendant Vipin Shah and Defendant Wexford Health Sources, Inc. as parties to this action and update the docket sheet in accordance with footnote 1.

Jones's claims within Count 1 against Defendant Seth Meracle and Count 2 against Defendant Michael Clark are the only claims that remain pending.

A status conference will be set by separate order for the purpose of selecting firm dates for a final pretrial conference and jury trial.

**IT IS SO ORDERED.**

**DATED: March 28, 2019**

*/s/ Nancy J. Rosenstengel*

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**